FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta
FEB 20 2003
LUTHER D. THOMAS, Clerk
By: Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHRISTOPHER D. PRICKETT, ET AL,

Plaintiffs,

vs.

DEKALB COUNTY, ET AL

Defendants.

CIVIL ACTION FILE NO. 1:97-CV-3395-TWT

FAIR LABOR STANDARDS ACT CLASS ACTION

**PLAINTIFFS' MOTION FOR RECONSIDERATION**
**AND BRIEF IN SUPPORT THEREOF**

## I INTRODUCTION

The claim presented in this action is for overtime compensation pursuant to the FLSA (29 U.S.C. §207). On February 4, 2003, the court dismissed the claims of approximately 420 "consent" plaintiffs who executed "consent forms" to participate in this FLSA action wherein they agreed to be bound by the result in this lawsuit. Pursuant to Fed. R. Civ. P. 59, Plaintiffs respectfully move for reconsideration on this aspect of the order.

## II ARGUMENT AND CITATIONS OF AUTHORITY

### A. Dekalb County Failed To Assert Mis-Joinder of the Consent Plaintiffs' Claims In Its Answer And Has Waived Any Contention That The "Consent" Plaintiffs Are Not Properly Before The Court.

The "consent" mechanism provided for in 29 U.S.C. §216(b) is a permissive joinder device intended to avoid a multiplicity of suits. Fink v. Oliver Iron, 65 F.Supp 316 (D.C. Mn. 1941); Pentland v. Dravo, 152 F.2d 851 (3d Cir. 1954). Yet, for the



144

more than four years this lawsuit has been pending, the County sat silently by without ever once suggesting that the consent forms filed by the consent plaintiffs were insufficient with regard to the "tornado" claim. There is no mention of any such contention in the County's Answer; no mention in the County's initial summary judgment motion; and no mention when the case was before the Eleventh Circuit. Silence: for more than four years after the "claim" was injected into the case.[1]

Fed. R. Civ. P. 8(c) specifically requires a party to include all affirmative defenses in it's Answer. Failure to include an affirmative defense acts as a waiver of that defense. Day v. Liberty National Life Insurance Co., 122 F.3d 1012, 1015 (11th Cir. 1997); Moore v. Morgan, 922 F.2d 1553, 1557 (11th Cir. 1991). In this case the "proper party" argument now being advanced by the County plainly amounts to an "any other matter constituting an avoidance" contemplated by Rule 8(c). Accordingly---to the extent it desired to challenge the sufficiency of the consent forms executed by the "consent" plaintiffs----the County was obliged when it filed its Answer to the Supplemental Complaint to assert the same "proper party" affirmative defense it asserted in its initial answer. It did not do so. Its failure to do so amounts to a waiver of the defense. Day, supra, Morgan, supra.

---

[1]The court granted "Plaintiffs' First Motion to Supplement Complaint" (asserting the tornado claim), on September 28, 1998. The County filed its Answer to the Supplemental Complaint on October 14, 1998. The Answer to the Supplemental Complaint is *silent on the issue of joinder*, and makes no contention whatever that the claims of the so-called "consent" plaintiffs who had filed consent forms prior to the tornado crisis were not properly before the court. In contrast, the initial Complaint in this case was filed on November 10, 1997, and the County submitted its Answer on February 27, 1998 (before the tornado claim arose). In terms of parties, the County included in its Answer (as its Ninth Defense) the contention that "some or all of the parties or purported parties are not proper parties to this action."

The proper outcome of the County's failure to assert the "proper party" defense in its answer should not be determined in a vacuum: the manner in which the County has litigated this case during the four years since the filing of the Answer to the supplemental complaint should also be considered. During that entire time, the County has failed to assert any deficiency whatever regarding the consent forms filed by the "consent" plaintiffs at the beginning of the case, or to suggest that the consent forms were somehow ineffective to encompass the "tornado" claims.[2] Apart from failing to raise the issue in its Answer to the Supplemental Complaint, at no point in the original (and protracted) summary judgment proceedings before this court was the issue raised. At no point was the issue raised while the matter was on appeal.[3]

This Court should not countenance the County's sandbagging of a defense for nearly 5 years while it actively conducted the litigation without a peep concerning

---

[2]In their Brief In Opposition to Plaintiffs' Motion To Supplement the Complaint to add the tornado claims, the County implicitly acknowledged that the claim was being pressed by all of the plaintiffs----"named" and "consent" alike. There is no reference whatever in their opposition papers to any distinction between the claims of the "consent" and the "named" plaintiffs, and there is no suggestion at any point that the consent forms previously executed by the "consent" plaintiffs were ineffective to encompass the "tornado claim."

[3]On appeal, in fact, the County effectively conceded that the claims of the "named" plaintiffs were indistinguishable from the claims of the "consent" plaintiffs, and were properly before that Court. At page two of their brief before the Eleventh Circuit, the County described the course of proceedings in this case as follows: "On November 10, 1997, Plaintiffs-Appellants, who are all Dekalb County firefighters ***("the Firefighters")***, filed this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §201 et seq....By order dated September 28, 1998, the court permitted ***the Firefighters*** to amend their complaint to add a claim that they were allegedly denied sufficient overtime compensation for work performed during one week in April 1998." A true and accurate copy of the pertinent passage from the County's appellate brief is attached hereto as Exhibit "1". The County's appellate argument regarding the tornado claim (pp. 55-58 of the brief) likewise lumps the claims of the "named" plaintiffs and the "consent" plaintiffs together, with no hint that there is any distinction between the two.

any alleged deficiency relative to the consent forms on file with the court. Under the circumstances presented, the County plainly waived any right to argue, five years down the road (perhaps after the statute of limitations has run on the claims of the consent plaintiffs), that the consent forms were insufficient. Such an outcome would plainly constitute manifest injustice to the hundreds of fire fighters who explicitly consented to participate in this FLSA lawsuit and to be bound by its result.[4]

**B. Dismissal of the "Consent" Plaintiffs Who Filed Consent Forms <u>*After* The Tornado Claim Arose Would Constitute Reversible Error.</u>**

The County's purported rationale for asserting that the consent forms executed by the consent Plaintiffs were inadequate to include the tornado claim is that they were executed *before* the tornado disaster occurred . Thus, the argument goes, the consent forms were ineffective to embrace the tornado claim for adjudication in this action.

The argument, largely accepted by the court in the order of February 4, proceeds from the faulty factual premise that all of the consent plaintiffs signed and filed their consent forms *before* the tornado claim arose. The premise, however, is simply incorrect. The record reveals that a number of "consent" plaintiffs signed and filed their consent forms *after* the tornado claim arose. For example, in June of 1999 (more than one year after the tornado claim arose), and after the tornado claim was

---

[4]Dismissing the claims of the "consent" plaintiffs is plainly not necessary. To the extent the Court has concerns relative to sufficiency of the original consent forms, the court would be free to order the "consent" plaintiffs joined as "named" plaintiffs, or to hold that the supplemental complaint approved in September of 1998 acted as a constructive supplementation of the consent forms themselves.

injected into the litigation, eight plaintiffs signed and submitted their consent forms. The tornado claims of those consent plaintiffs (and any other plaintiffs who submitted their consent forms after the tornado claim arose in April of 1998) are not susceptible of dismissal on the basis that consent forms were signed before the tornado disaster occurred.

The tornado disaster occurred in April of 1998. Plaintiffs moved the court to supplement the complaint to include that claim in July of 1998. The Court granted the motion in September of 1998. Plaintiffs respectfully submit that all consent plaintiffs who submitted consent forms after the April 9, 1998 (the beginning of the tornado disaster) are properly before the Court. At an absolute minimum, the claims of all consent plaintiffs who submitted their consent forms after the court's order permitting supplementation of the complaint are properly before the court.

**C. Dismissal of the Consent Plaintiffs Who Filed Consent Forms Prior To April of 1998 Constitutes Reversible Error Because The Initial Consent Forms Operated To Confer True "Plaintiff" Status On Those Who Consent To The Case, Including The Right To Amend Or Supplement Their Claims Pursuant To Rule 15.**

Pursuant to specific language of the "consent" provision at issue in this case, once the Plaintiffs filed their consent forms with the court, they were for all intents and purposes "plaintiffs" properly before the Court. Based on this, the consent plaintiffs were entitled, like the "named" plaintiffs, to amend and/or supplement the complaint as appropriate.[5]

---

[5]The Court's initial order granting summary judgment in this case implicitly recognized that once the consent plaintiffs joined the case by way of filing their consent forms, they stood in

29 U.S.C. §216(b) provides as follows:

> An action...may be maintained against any employer..by any one or more employees for and in behalf of himself and other employees similarly situated. No employee shall be ***a party plaintiff*** to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court....

The plain language of the statute is clear: once a person "consents" to an FLSA action via consent form, the result is that they are "plaintiffs" properly before the court. See, Haynes v. Singer Co., 696 F.2d 884 (11th Cir. 1983); Anson v. University of Texas, 962 F.2d 539 (5th Cir. 1992); Burget v. Cudahy, 361 F.Supp 617 (D. Kan. 1973). By filing their "consent forms" with the Court, therefore, the "consent" plaintiffs became true "parties" in this action.

Pursuant to Fed. R. Civ. P. 15, parties may amend/supplement their pleadings with leave of the Court. In this case, all of the Plaintiffs ("consent" and "named" alike) moved the Court for leave to supplement the Complaint to add the "tornado claim" on July 28, 1998. By that time, the vast majority of the "non-named" plaintiffs had consented to the case by way of written consent forms. There is nothing in the language of §216(b) which would support a conclusion that although the consent plaintiffs are properly before the court as plaintiffs, they, unlike "named" plaintiffs,

---

the same shoes as "plaintiffs" as the "named" plaintiffs. In this regard, on page one of the order (dated March 29, 2000), the Court noted: "Plaintiffs are 426 current and former Fire Services Bureau employees of the Dekalb County Department of Public Safety." Likewise, in the section of the Order dealing with the "tornado claim" (pp. 25-26), the court references "Plaintiffs' claim for overtime compensation for work performed in the aftermath of tornadoes that struck the county in April of 1998". These passages of the Order, read together, plainly evince an understanding that the tornado claims were being pressed on behalf of ***all 426 plaintiffs***.

have no right to amend or supplement pleadings under Rule 15.[6]

There is no policy justification which would support a new rule which eviscerates the right of "consent" plaintiffs—already properly before the Court----to amend and/or supplement their claim. By "opting in" they authorized pursuit of claims for overtime under the FLSA, including the alternative legal theory which arose with the occurrence of the tornado disaster. By stripping "consent" plaintiffs of rights that "named" plaintiffs plainly have under Rule 15, the principle of broadly and liberally construing the FLSA is done a grave disservice.

**2. The "Tornado Claim" Was Merely An Alternative Legal Theory Entitling Plaintiffs to Collect Overtime Compensation Under §207 Of The FLSA—The Identical Cause of Action Which The Consent Plaintiffs Authorized Via Consent Forms.**

As noted in Plaintiffs' Brief In Support of Motion to Supplement Complaint, "the cause of action set forth in the supplemental complaint will be subsumed by relief being granted on the original complaint, but will not be extinguished should relief be denied on the original complaint." In other words, the claim represented merely an alternative legal theory which would entitle all of the Plaintiffs then

[6]The Court's statement in the February 4 Order that "The claims arising out of the tornado disaster are completely separate, independent, and unrelated to the claims originally asserted in the Complaint" and that "Allowing the Plaintiffs to assert these claims on behalf of others, in essence, allows them to pursue a Rule 23 class action as to those claims... The action would proceed without the procedural safeguards of or Rule 23, including the right to opt out under Rule 23(c), or the necessity to opt-in under Section 16(b) of the FLSA" overlook the fact that all of the so-called "consent" plaintiffs had previously executed written consent forms explicitly consenting to the pursuit of identical §207 overtime claims under the FLSA, including a specific claim for overtime for all hours worked in excess of 40 per week. To this extent, the "safeguard" inherent in Section 16(b) had already been put in place, as all "consent" plaintiff had previously authorized precisely such a claim, and agreed to bound by the outcome.

properly before the court ("named" and "consent alike") to recover even if the Section 207 claim embodied in the initial complaint failed. The accuracy of this statement has been borne out by the subsequent proceedings in this case.

Based on the County's failure to object to the original consent forms, based on the fact the cause of action and the relief sought via the supplemental complaint were identical to that pled and sought in the initial complaint, the approximately 420 consent plaintiffs (the vast majority of whom had by then been before the court for nearly one year) did not file 420 new "consent forms". Under these circumstances, Plaintiffs and their Counsel could not imagine that "each plaintiffs' act of signing the document was a futile exercise in penmanship." Motalvo v. Tower Life Building, 426 F.2d 1135 (5th Cir. 1970). As pointed out in Allen v. Atlantic Richfield, 724 F.2d 1131 (5th Cir. 1984), "The statute does not require time-and-resource-consuming filings."

The requirements of the "consent" mechanism set forth in 29 U.S.C. §216(b) must be measured by the purpose and policy it is intended to serve. The cases make clear that the two purposes of the "consent" mechanism are "evidence a willingness to be bound by the outcome of the suit, Kuhn v. Philadelphia Electric Co, 475 F.Supp 324 (E.D. Pa. 1979); Davila v. Weinberger, 600 F.Supp. 599 (D.C. D. C. 1985), and to make clear to the Defendant precisely which persons were asserting the claim against it. Allen, supra. In this case, there can be no doubt that both purposes have been fully served via the filing of consent forms and via the subsequent supplement to the complaint by counsel for *all plaintiffs:* the plaintiffs have "consented" to be

bound, and the County has always known the identity of its adversaries. Having satisfied the purpose of the consent mechanism, there is no justification for holding the consent forms at issue in this case inadequate.

### 3. No Supplemental Consent Forms Were <u>Required to Be Filed by The Consented Plaintiffs</u>.

There is, admittedly, a relative dearth of case authority on the issue before the court: whether there is requirement for seriatim filings of "consent forms" as additional claims are added to an FLSA collective action.[7] Several cases, however, have previously addressed the issue, and both have concluded that there no requirement for "consent" plaintiffs to file new consent forms with the addition of new claims.

In <u>Aaron v. City of Wichita</u>, 1993 U.S. Dist. LEXIS 4791 (No. 90-1536-PFK, D. Kan. 1993), reversed on other grounds, 54 F.3d 653 (10th Cir. 1995)(copy attached hereto as Exhibit "2"), the Court specifically held that where new claims are added by way of amendment to an existing FLSA collective action, there is no requirement that the plaintiffs file new "consent forms." In <u>Aaron</u>, the plaintiffs initiated an FLSA action claiming that the City improperly "failed to compute overtime compensation by use of the correct regular rate" and that "the City had improperly included Kelly day hours in its calculation of the hourly rate." Subsequently, Plaintiffs filed an amended complaint, asserting a separate and distinct theory: that the City had also

---

[7]As the Court observed in its February 4, 2003 Order, however, "Section 216(b) does not state that employees who already filed consent forms, and thereby become plaintiffs, must file new and separate consent forms as new claims arise." Order, p. 7.

improperly "included overtime hours, as well as Kelly hours, to determine the divisor of all hours worked." At or about the same time, the "consent" plaintiffs filed supplemental consent forms, which as discussed below, the Court found were absolutely unnecessary. Subsequently, the City argued that the initial consent forms signed by the "consent" plaintiffs were not sufficient to encompass the new claim asserted in the amended complaint. The Court disagreed:

> The City appears to be making the argument that the earlier consents could not properly be used to show consent to the fourth amended complaint because the plaintiffs were not put on adequate notice of the claims brought by plaintiffs' attorneys.
>
> *********************
>
> The original consent stated the individual was consenting to becoming a party plaintiff in this case "which asserts FLSA claims" against the City. The fourth amended complaint claims that the City violated the FLSA by including overtime hours and Kelly hours in its calculation of the regular rate of pay. Certainly, this is a FLSA claim as consented to by each individual who opted in by filing an original consent. ***There appears to be no reason for the plaintiffs to have filed supplemental consent forms.*** Because the original consents are sufficient to allow the plaintiffs to have standing to make the claim regarding the violation of the regular rate, the filing date of the supplemental consents should not be used as the date for recalculating the hourly rates.

In reaching the conclusion that the initial consent forms were adequate and that no supplemental consent forms were required to support the claims set out in the fourth amended complaint, the Aaron court cited to a prior district court case, Sperling v. Hoffman-Laroche, Inc., 119 F.R.D. 165 (D. N.J. 1989), quoting as follows:

> ...defendant complains because that the letter and [consent]

> form fail to explain that plaintiffs might try their case at least in part under a disparate impact theory. These are silly objections...I find no harm caused by the failure of the letter and consent form to discuss disparate impact theory. Read ***together, the letter and form make clear that the named plaintiffs in the action would exercise their discretion to select counsel, and that anyone opting in would be bound by the results of counsel's efforts...Certainly, for defendant to demand that opt-ins receive up-front detail regarding alternative legal theories under the ADEA verges on the ludicrous.*** 118 F.R.D. at 408-09.

Aaron and Hoffman-Laroche are not the only decisions suggesting that the consent form in this case were adequate for the purpose for which they were intended (ie, demonstrate the signatories' willingness to be bound by the outcome of the case). The same result obtained in Kuhn v. Philadelphia Electric Company, supra. In Kuhn, the plaintiffs initially brought Rule 23 class action gender discrimination claims under Title VII. Later, they amended their complaint to assert liability under the Equal Pay Act which, like the ADEA, incorporates the "collective action" vehicle embodied in 29 U.S.C. §216(b). The plaintiffs filed their consent forms before the court's granted plaintiffs' motion to add the Equal Pay Act claim, and Defendants moved to strike the consent forms because they were filed before EPA claims were actually before the court. The Court denied the motion, noting that:

> Defendants' position accurately reflects, no doubt, the normal sequence of filing in an Equal Pay Act case. In a routine case, common sense suggests that a complain would initially be filed and that thereafter persons desiring to become parties would file their consents. This position is supported, we believe, by the wording of 29 U.S.C. §256. That section appears to anticipate that consents will be filed concurrently with the complaint or they will be filed subsequently. ***Neither §216(b) nor §256 specifically***

> ***provides, however, that consents may not be filed prior to a complaint. Defendant, in effect, asks us to graft that limitation onto §216(b). In the absence of specific language in the statute, we decline to strike the consents for this reason....*** The requirement of filing consents serves at least two purposes in a §216(b) suit. One is, as the name suggests, to evidence a willingness to be bound by the outcome of the suit...Our decision that the consents need not be stricken merely because they were filed before we permitted plaintiffs to amend their complaint to allege an Equal Pay Act claim means that we will not require the consenting parties to manifest again their willingness to be bound by these proceedings. 600 F.Supp. at

## IV <u>CONCLUSION</u>

For the foregoing reasons, the Court should reconsider its Order of February 4, 2003. Some of the "consent" plaintiffs joined this action ***after*** the tornado disaster in April of 1998. The other "consent" plaintiffs had previously executed written consent forms specifically authorizing the pursuit of overtime claims under §207. The County never raised any assertion that these consent forms were inadequate to encompass the tornado claims during the 4 years leading up to its most recent summary judgment motion, and has therefore waived any such contention via failing to raise it in its answer and through its sandbagging the issue for years. No legitimate justification exists—either in policy or in the language of the statute----for denying the consent Plaintiffs their right to supplement as provided in Rule 15.

Respectfully submitted this 20th day of February, 2003..

A. Lee Parks
State Bar No. 563750
Parks, Chesin & Walbert, P.C.
75 Fourteenth Street
Suite 2600
Atlanta, Georgia 30309
(404) 873-8000

(w/ perm by ALP)

Harlan S. Miller
State Bar No. 506709
Miller, Billips & Ates, P.C.
730 Peachtree Street
Suite 750
Atlanta, Georgia 30308
(303) 969-4101

United States District Court ★ Northern District of Georgia ★

# EXHIBIT / ATTACHMENT

A

(To be scanned in place of tab)

## STATEMENT OF THE CASE

### I. Course Of Proceedings

On November 10, 1997, Plaintiffs-Appellants, who are all DeKalb County firefighters ("the Firefighters"), filed this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. in the Northern District of Georgia. The Firefighters allege that they were improperly denied overtime compensation in violation of the FLSA. They also claim that Battalion Chiefs and Captains should not be exempt from overtime under the administrative/executive exemption. By order dated September 22, 1998, the district court permitted the Firefighters to amend their complaint to add a claim that they allegedly were denied sufficient overtime compensation for work performed during one week in April 1998.

At the conclusion of discovery, the parties filed cross motions for summary judgment. On March 29, 2000, the district court granted DeKalb County's motion for summary judgment and denied the Firefighters' motion.

The Firefighters filed their Notice of Appeal of the district court's decision on April 11, 2000.

Hollywood, 120 F.3d 1178, 1180 (11th Cir. 1997), the evidence revealed six disciplinary suspensions of salaried employees. This Court noted that the city made deductions for "disciplinary suspensions, not for lack of work" and that the city subsequently reimbursed employees whose salaries were deducted for disciplinary suspensions. Id. Likewise, in Arrington v. City of Macon, 973 F. Supp. 1467 (M.D. Ga. 1997), the city subjected 11 of 39 salaried officers to disciplinary pay deductions for reasons other than major safety violations. Nevertheless, the court held that the city was entitled to utilize the "window of correction" to correct these deductions. Id. at 1474-75.

Indeed, the case law cited immediately above clearly demonstrates that the "window of correction" is available even in cases involving more widespread improper pay deductions than this case.

### C. FIREFIGHTERS WERE NOT ENTITLED TO OVERTIME BASED ON A 40 HOUR WORKWEEK FOR THE TIME WORKED IN THE AFTERMATH OF THE TORNADOES

#### 1. The District Court Correctly Concluded That Chief Perez Did Not Have Authority To Change the Firefighters' Work Period

The Firefighters repeatedly cite to former Fire Chief Perez's deposition testimony in the Firefighters' claim for overtime based on a 40-hour workweek in the aftermath of the tornadoes is nothing more than a self-serving attempt to gain a $427,000 windfall. (Crider Aff.-Doc. 76-Ex.6-¶7; UF-Doc. 76-¶231.) Regardless

of how many times Perez states that he attempted to change the work shift for the one week following the tornadoes, or that he thinks Director Brown gave him permission to change the work shift, the district court properly granted summary judgment because Perez did not have legal authority to change the FLSA work period.

Pursuant to DeKalb County Code of Ordinances § 20-161, the FLSA work period can only be changed by the head of the Department with the concurrence of the Personnel Director and the approval of the Chief Executive Officer. The record is devoid of any evidence, and indeed the Firefighters do not contend, that Richard Conley, the County's Personnel Director, or Liane Levetan, DeKalb County's Chief Executive Officer, authorized a change in the Firefighters' work period for the days the Alpha/Bravo plan was in effect. The Firefighters' contention that Perez placed the Firefighters on the Alpha/Bravo shift and that he did so with what he believed was Director Brown's permission is irrelevant. Even if true, the Firefighters' contention has no legal or practical effect on the Firefighters' claim because it does not demonstrate that the work period was changed.

Because there is no evidence that DeKalb County changed the work period for the Firefighters in the aftermath of the tornadoes, the Firefighters are not entitled to overtime based on a 40 hour workweek. Accordingly, this Court should

affirm the district court's grant of summary judgment in favor of DeKalb County on this claim.

### 2. The District Court Correctly Determined That DeKalb County Cannot Be Held Liable For Overtime Based On The Unauthorized Actions Of Its Agent

The Firefighters' final argument is that, even if Perez did not have authority to change their work period, DeKalb County cannot escape liability by suggesting that lower-level employees are responsible for an FLSA violation. In the instant case, however, there is no violation of the FLSA. It is undisputed that all firefighters who worked more than 212 hours during the 28-day period that included the aftermath of the tornadoes received overtime in accordance with the FLSA and DeKalb County policy. (Crider Aff.-Doc. 76-Ex.6-¶7; UF-Doc. 76 ¶231.) Simply put, there is no legal basis under the FLSA to support the Firefighters' claim that they are, in essence, entitled to even more overtime pay than is mandated by the FLSA.

In their brief, the Firefighters cite to three Fifth Circuit cases for the proposition that an employer cannot avoid liability under the FLSA by arguing that lower-level employees are responsible for the violations. Those cases differ from the instant case in that they all involve situations where an employer has violated the FLSA. In Brennan v. General Motors Acceptance Corp., 482 F.2d 825, 826-27 (5th Cir. 1973), the court found the employer liable because it had constructive

knowledge of employees working overtime without reporting it in violation of the overtime and record keeping provisions of the FLSA. Similarly, in LeCompte v. Chrysler Credit Corp., 780 F.2d 1260, 1263 (5th Cir. 1986), the employer could not avoid liquidated damages through "blissful ignorance" of the fact that employees were working significant overtime without compensation. Finally, in Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 466 (5th Cir. 1979), the court found that an employer who "flagrantly violated" the FLSA could not avoid liquidated damages because "it simply did not know and did not understand exactly" how to compensate its employees.

The Firefighters' brief is completely devoid of any argument or authority suggesting that DeKalb County violated the FLSA by not paying the Firefighters overtime based upon a 40-hour workweek. Indeed, DeKalb County, in compliance with the FLSA, paid $142,594.00 in overtime compensation to firefighters for their work during the aftermath of the tornadoes. (Crider Aff.-Doc. 76-Ex.6-¶7; UF-Doc. 76 ¶231.) There is no dispute in the record that DeKalb County complied with the FLSA during the aftermath of the tornadoes. The Firefighters simply want overtime compensation above and beyond that which is required by the FLSA.

# EXHIBIT / ATTACHMENT

B

(To be scanned in place of tab)

Service: **Get by LEXSEE®**
Citation: **54 F3d 652**

*54 F.3d 652, *; 1995 U.S. App. LEXIS 10352, **;*
*130 Lab. Cas. (CCH) P33,228*

RONALD L. AARON, et al., Plaintiffs-Appellees/, Cross-Appellants, v. THE CITY OF WICHITA, KANSAS, Defendant-Appellant/, Cross-Appellee.

Nos. 93-3245, 93-3262

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

54 F.3d 652; 1995 U.S. App. LEXIS 10352; 130 Lab. Cas. (CCH) P33,228

May 9, 1995, Filed

**SUBSEQUENT HISTORY: [**1]** Certiorari Denied November 6, 1995, Reported at: 1995 U.S. LEXIS 7446.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Kansas. (D.C. No. 90-1536-PFK). (797 F.Supp. 898; 822 F.Supp. 683). D.C. Judge PATRICK F. KELLY.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Defendant city appealed the judgment of the United States District Court for the District of Kansas, which granted summary judgment in favor of plaintiffs, rank and file firefighters and supervisory firefighters, on their claims for violations of the Fair Labor Standards Act.

**OVERVIEW:** Plaintiffs, rank and file firefighters and supervisory firefighters, filed a complaint against defendant city alleging that it violated the Federal Labor Standards Act (FLSA). The trial court granted summary judgment in favor of plaintiffs and defendant appealed. On appeal, the court reversed the order of the trial court because defendant's pay scheme was consistent with the FLSA. Because the designated base salary was intended to cover overtime hours and non-overtime hours, it was necessary to use the total hours, including overtime hours, in the calculation because a failure to do so would result in a rate that was not representative of the rate for the non-overtime workweek. This included "Kelly Days," which were a form of paid vacation. The formula used was also consistent with the parties' agreement. The court reversed the finding that plaintiff supervisory firefighters were not salaried employees under the executive exception to the FLSA because there was no evidence that defendant had a policy of docking pay for time missed. The court remanded for application of the duties test to see if the executive exception covered plaintiff supervisory firefighters.

**OUTCOME:** The court reversed the decision granting summary judgment in favor of plaintiff rank and file firefighters and dismissed their claim because defendant city calculated the pay rate according to the Fair Labor Standards Act and the parties' agreement. The finding that plaintiff supervisory firefighters were not salaried was reversed and the case remanded for application of the executive exception's second test, the duties test.

**CORE TERMS:** firefighter, salary, regular rate, overtime, hourly rate, bi-weekly, formula, non-overtime, exemption, regulation, exempt, duty, captains, compensated, one-half,

hourly, wage, matter of law, actually paid, hours worked, workweek, accrued, regular, compute, divisor, docking, spend, summary judgment, rank and file, hours of work

**LexisNexis(TM) HEADNOTES - Core Concepts - ♦ Hide Concepts**

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions

*HN1* The regular rate is the hourly rate actually paid to the employee for the normal, non-overtime work week for which he is employed. The regular rate is a rate per hour, but employers are not required to compensate employees on an hourly basis. 29 C.F.R. § 778.109 (1993). If an employee is employed on a salary basis, his regular hourly rate is computed by dividing the salary by the number of hours for which the salary is intended to compensate. 29 C.F.R. § 778.113 (1993) .

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions

*HN2* The regulations provide that a base salary used to calculate a regular rate can be intended to cover more than 40 hours in one week. 29 C.F.R. § 778.325 (1993).

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions

*HN3* A wage plan is not rendered invalid simply because instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom. If a designated base salary is intended to cover overtime hours as well as non-overtime hours, it is necessary to divide the salary by the total hours and not just the non-overtime hours because a failure to do so will result in a rate that is not representative of the rate actually paid for the "normal, non-overtime workweek." If a salary includes a premium for overtime work, it must be deducted before dividing the salary by the number of hours worked so that the resulting rate is not inflated by the overtime premium.

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions

*HN4* When determining the number of hours a salary is intended to cover, the contract between the parties is not necessarily determinative. The regular rate is an actual fact, and in testing the validity of a wage agreement under the Fair Labor Standards Act the courts are required to look beyond that which the parties have purported to do.

Labor & Employment Law > Wage & Hour Laws > Exemptions

*HN5* The Fair Labor Standards Act (FLSA) exempts any employee employed in a bona fide executive, administrative, and professional capacity from the overtime requirements of 29 U.S.C.S. §§ 206 and 207. 29 U.S.C.S. § 213(a)(1). The employer has the burden of showing that its employees are exempt from the FLSA's overtime provisions. Federal regulations provide two tests for determining whether an employee qualifies for the executive exemption. 29 C.F.R. § 541.1 (1994). Under the "short test," exempt status is given to any employee: who is compensated on a salary basis at a rate of not less than $ 250 per week, and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein. 29 C.F.R. § 541.1(f).

Labor & Employment Law > Wage & Hour Laws > Exemptions

*HN6* Exemptions to the Fair Labor Standards Act are to be narrowly construed; the

employer must show that the employee fits plainly and unmistakenly within the exemption's terms -- under both the "salary" test and the "duties" test. An employer must prove that the employee is exempt by "clear and affirmative" evidence.

Labor & Employment Law > Wage & Hour Laws > Exemptions

*HN7* Under both the short and long test for the executive exemption, the employer must prove that the employees in question are paid on a salary basis rather than an hourly rate. 29 C.F.R. § 541.1(f). According to 29 C.F.R. § 541.118(a) (1994), an employee is compensated on a salary basis if under his employment agreement he regularly receives each pay period a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

Labor & Employment Law > Wage & Hour Laws > Exemptions

*HN8* The short test in 29 C.F.R. § 541.1 also requires that to fall under the executive exemption, the employees in question must: 1) have as their primary duty the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; and 2) this duty must include the customary and regular direction of the work of two or more other employees therein. 29 C.F.R. § 541.1(f). As a "rule of thumb," an employee's primary duty is executive if the employee spends more than 50 percent of his or her time performing management type functions.

**COUNSEL:** Charles W. Harris, Curfman, Harris, Rose, Weltz & Smith, Wichita, Kansas (Ronald D. Innes, Wichita, Kansas, with him on the brief), for Plaintiffs-Appellees/Cross-Appellants.

Richard D. Ewy, Foulston & Siefkin, Wichita, Kansas (Robert L. Howard and Timothy B. Mustaine, Foulston & Siefkin, Wichita, Kansas, with him on the brief), for Defendant-Appellant/Cross-Appellee.

**JUDGES:** Before EBEL, MCKAY, and REAVLEY *, Circuit Judges.

* The Honorable Thomas M. Reavley, United States Court of Appeals, Fifth Circuit, sitting by designation.

**OPINIONBY:** REAVLEY

**OPINION:**

**[*653]** REAVLEY, Circuit Judge.

City firefighters sued the City of Wichita (the "City") for wages due under the Fair Labor Standards Act ("FLSA"). The district **[*654]** court concluded that the City had violated the FLSA by improperly calculating the "regular rate" of pay used to compute overtime and by exempting certain employees from FLSA overtime requirements and granted summary judgment for the firefighters. We reverse. We dismiss the firefighters' claims that the City calculated **[**2]** an improper FLSA "regular rate," and we remand the claims by the Fire Captains, Fire Division Chiefs, and Fire Battalion Chiefs that the City had improperly exempted them from FLSA overtime requirements for a "duties test" determination.

BACKGROUND

The firefighters in this suit work shifts of 24 consecutive hours, followed by 48 consecutive unpaid hours off work. The firefighters are in "pay status" (at work or on paid leave, such as sick leave or vacation) 56 hours per week, on average, or 112 hours every two weeks. During the years in question in this case, the employment terms for the rank and file firefighters (as distinguished from the Captains and Chiefs) were specified in written Memoranda of Agreement ("MOAs") collectively bargained between the International Association of Fire Fighters ("IAFF") and the City. Two of the MOAs for the years relevant to this case contain pay schedules indicating both bi-weekly salaries and hourly rates and the MOA for one year indicates an hourly rate only. However, both parties concede that the appropriate regular rate should be based on the bi-weekly salaries agreed upon in the bargaining process. Both parties also agree that the rank **[**3]** and file firefighters were paid for every hour worked even though the regular rate was derived from a negotiated bi-weekly "salary." The only dispute is over how many hours the bi-weekly salary was intended to compensate.

The firefighters contend that the salaries in the MOA schedules divided by the average number of non-overtime hours worked by the firefighters equals the appropriate hourly rate. The City contends that these salaries should be divided by the average number of hours the firefighters are in "pay status" during a bi-weekly period (112). In the MOA schedules with both bi-weekly and hourly rates, the bi-weekly salaries divided by the corresponding hourly rate equals 112, indicating that the hourly rates in these schedules were determined by dividing the MOA bi-weekly salaries by 112 hours. Therefore, the City's formula for the regular rate has support in the written MOAs signed by both parties.

During the MOA negotiations, the firefighters' representative objected to the City's formula for computing the hourly rate, arguing that 112 was not the correct divisor. Yet, the firefighters signed the agreements without insisting on a different designated hourly rate. It is **[**4]** undisputed that the firefighters were actually paid at the bi-weekly period for every non-overtime hour worked at the regular rate computed using the City's formula and for every overtime hour at one and one-half times the regular rate computed using this formula.

The firefighters' complaint alleged that the City had violated the FLSA because the City: 1) failed to pay them for sleep and meal-time hours; 2) improperly exempted Fire Captains, Battalion Chiefs and Division Chiefs from overtime requirements; and 3) disregarded controlling regular rate principles by designating an artificial hourly rate of pay derived by dividing plaintiffs' salaries by an overstated divisor. The firefighters moved for summary judgment on all three claims and asked for a finding of willfulness on the part of the City which would extend recovery from two to three years. The City, on the other hand, contended that, even if it did violate FLSA, its actions were based on an objectively reasonable good faith belief that it was complying with the FLSA, and it was therefore not obligated to pay liquidated damages under 29 U.S.C. 216(b).

The district court disposed of the case by summary judgment. The first **[**5]** claim for unpaid hours was denied, but the court granted the firefighters summary judgment on the second and third claims after finding that the regular rate of pay was improperly calculated and that the Fire Captains, Battalion Chiefs, and Division Chiefs were not exempt from FLSA requirements. The court ruled for the City on the willfulness and good faith issues. The firefighters appeal the court's **[*655]** judgment denying awards for willfulness and bad faith. The City appeals the judgment awarding the firefighters a substantial unpaid wages recovery. We reverse and render judgment for the City on the firefighters' regular rate claims, but we remand the claims by the Fire Captains, Fire Division Chiefs, and Fire Battalion Chiefs that they were improperly exempted from FLSA overtime requirements.

DISCUSSION

I. Determining the Regular Rate under the FLSA.

HN1 The regular rate is the hourly rate actually paid to the employee for the normal, non-overtime work week for which he is employed. 149 Madison Ave. Corp. v. Asselta, 331 U.S. 199, 203, 91 L. Ed. 1432, 67 S. Ct. 1178, modified, 331 U.S. 795 (1947); Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 40, 89 L. Ed. 29, 65 S. Ct. 11 (1944). The regular rate is a rate per hour, **[**6]** but employers are not required to compensate employees on an hourly basis. 29 C.F.R. 778.109 (1993). If an employee is employed on a salary basis, his regular hourly rate is computed by dividing the salary by the number of hours for which the salary is intended to compensate. 29 C.F.R. 778.113 (1993).

The firefighters were paid based on the number of hours they worked, but the hourly rate was based on a designated "base salary" indicated in the MOAs. The dispute centers on the number of hours the designated salary was intended to cover. The firefighters claim that it was only intended to cover non-overtime hours. The City contends that it was intended to cover 112 hours, which includes some overtime hours. The MOAs support the City's contention because the hourly rates indicated in the MOAs are equivalent to the salaries indicated in the MOAs divided by 112.

The district court concluded as a matter of law that the City's calculation for the regular rate could not be correct, because overtime hours could not be used in calculating the regular rate. This interpretation is clearly inconsistent with FLSA regulations. HN2 The regulations provide that a base salary used to calculate a regular **[**7]** rate can be intended to cover more than 40 hours in one week and the regulations illustrate how to deal with the calculation of the regular rate in such a case. 29 C.F.R. 778.325 (1993). The example given in the regulations states:

If an employee whose maximum hours standard is 40 hours was hired at a fixed salary of $ 275 for 55 hours of work, he was entitled to a statutory overtime premium for the 15 hours in excess of 40 at the rate of $ 2.50 per hour (half-time) in addition to his salary, and the statutory overtime pay of $ 7.50 per hour (time and one-half) for any hours worked in excess of 55. Id.

The City claims, and the MOAs indicate, that this was the type of arrangement agreed to by the City and the firefighters. The bi-weekly salaries found in the MOAs were intended to cover 112 hours of work for each pay period. Therefore, the regular rate consisted of the MOA-designated bi-weekly salary divided by 112. The MOA bi-weekly salary compensated the firefighters at that rate for up to 112 hours of work. If a firefighter worked a total of 112 hours, some of those hours would be considered overtime hours, and therefore, the firefighters would also receive one-half the **[**8]** regular rate for each of those hours. Any hours worked over 112 were all overtime hours and the firefighters would be entitled to one and one-half times the regular rate for those hours. This pay scheme is clearly consistent with the FLSA regulations.

The district court held that such a method of computing the regular rate was invalid as a matter of law because overtime hours cannot be used in computing the regular rate of pay. In coming to this conclusion, the district court relied on 149 Madison Ave. Corp., 331 U.S. 199 (1947). In that case, the Supreme Court stated that the regular rate is the rate actually paid for the "normal, non-overtime workweek." Id. at 204. In referring to the "normal, non-overtime workweek" the Court was not discussing how to compute the regular rate from a salary, but was stating that the object of that computation is to determine what rate was being paid **[*656]** for the non-overtime workweek unaffected by any inflated rate paid for overtime work hours. The implication of the Supreme Court's statement is not, as the district court concluded, that overtime hours cannot be used when deriving the regular rate from a salary. Indeed, the Court also stated that,

HN3

A [**9] wage plan is not rendered invalid simply because instead of stating directly an hourly rate of pay in an amount consistent with the statutory requirements, the parties have seen fit to stipulate a weekly wage inclusive of regular and overtime compensation for a workweek in excess of 40 hours and have provided a formula whereby the appropriate hourly rate may be derived therefrom. Id.

If a designated base salary is intended to cover overtime hours as well as non-overtime hours, it is necessary to divide the salary by the total hours and not just the non-overtime hours because a failure to do so will result in a rate that is not representative of the rate actually paid for the "normal, non-overtime workweek." The Supreme Court has stated that if a salary includes a premium for overtime work, it must be deducted before dividing the salary by the number of hours worked so that the resulting rate is not inflated by the overtime premium. Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 68 S. Ct. 1186, 1196, 92 L. Ed. 1502 (1948). The district court in this case apparently confused the concepts of overtime premiums and overtime hours.

In their appeal to this court, the firefighters apparently concede that the **[**10]** MOA salaries should be used to compute the regular rate. The firefighters also do not argue that overtime hours cannot be used in the divisor of the formula for determining the regular rate as a matter of law, as the district court held. The firefighters instead argue on appeal that the rate determined using 112 as the divisor is "fictitious" because 1) it includes "Kelly Days" which cannot be used to understate the hourly rate; and 2) it does not represent the parties' intent.

The firefighters argue that they have historically been given time off in order to reduce overtime. Because, they argue, these days off ("Kelly days") were meant to reduce overtime rather than provide compensated time off, they should not have been included in the divisor for purposes of calculating the regular rate. However, after reviewing the record, we believe that "Kelly days" were simply another form of paid vacation and, therefore, properly included in hours to be compensated by the regular bi-weekly salary.

In support of their contention that the MOA salary was not intended to cover 112 hours of work, the firefighters point to the fact that their representative objected to the City's formula during **[**11]** negotiations for one of the MOAs. They also point to the fact that during MOA negotiations, the firefighters' attorney sent a letter to the City stating that the firefighters acknowledged the City's formula for determining the regular rate, as evidenced in the particular MOA being negotiated at the time, but also stating that the "Union is not waiving its right to additional compensation should a court of competent jurisdiction later determine that [the City's formula] is in error." This statement does not change the fact that the firefighters signed the contract in question and both the City and the firefighters abided by its terms. In addition, on its face, the contract, including the City's formula for the regular rate, does not violate the FLSA, giving a court of competent jurisdiction no reason to determine that it is in error.

The Supreme Court has held, however, that HN4 when determining the number of hours a salary is intended to cover, the contract between the parties is not necessarily determinative. 149 Madison Ave., 331 U.S. at 204, 67 S. Ct. at 1181. The Court stated that the regular rate is an "'actual fact,' and in testing the validity of a wage agreement under the **[**12]** Act the courts are required to look beyond that which the parties have purported to do." Id. (citing Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424, 65 S. Ct. 1242, 1244, 89 L. Ed. 1705 (1945)); see also, Bay Ridge Operating Co., 334 U.S. at 464, 68 S. Ct. at 1195-96 (holding that the "words and practices under the contract are the determinative facts in finding the regular rate"). In 149 Madison Ave., the Court determined that the facts in that case **[*657]** showed that, although the contract stated that the hourly rate should be derived through the use of a formula stated in the contract, the hourly rate actually paid

was not consistent with that formula. 331 U.S. at 208.

The district court in this case found that the firefighters were compensated for every hour worked. The firefighters do not contend that the rate actually received by them is not the rate specified in the MOAs, nor do they contend that they did not receive one and one-half times that rate for every overtime hour worked. The firefighters merely argue that the rate specified in the MOAs, the rate actually received by them, was not a valid rate under the FLSA. The district court agreed because it erroneously **[**13]** concluded that, as a matter of law, overtime hours could not be used in calculating the regular rate. This interpretation of the FLSA is incorrect. The FLSA does not preclude the coverage of overtime hours in a salary used to compute the regular rate. If the parties intended a salary to cover overtime hours, the regular rate cannot be inflated by subtracting those hours from the number of hours divided into the salary. The contract in question, as well as the actual practices of the parties, clearly indicate that the base salaries in the MOAs were intended to cover a standard 56 hour work week or 112 hours per bi-weekly pay period. The regular rate so derived meets the minimum hourly wage requirements under the FLSA and all required overtime requirements were seemingly met by payment of time and one-half at that regular rate for all FLSA determined overtime hours. Therefore, the City's method of payment to the rank and file firefighters did not violate the FLSA.

II. Executive Exemption.

The Fire Captains, Fire Division Chiefs and Fire Battalion Chiefs have brought claims based on the fact that they were paid some overtime, but were not paid the amount of overtime that an **[**14]** employee protected by the FLSA would have received, because the City considered them "executive employees" exempt from FLSA requirements. The Captains and Chiefs contend, and the district court held, that they are not "executive employees" as defined in the FLSA.

*HN5*The FLSA exempts any employee employed in a bona fide executive, administrative, and professional capacity from the overtime requirements of 29 U.S.C. 206 and 207. 29 U.S.C. 213(a)(1) (Supp. 1994). The employer has the burden of showing that its employees are exempt from the FLSA's overtime provisions. Corning Glass Works v. Brennan, 94 S. Ct. 2223, 2229 (1974). Federal regulations provide two tests for determining whether an employee qualifies for the executive exemption. 29 C.F.R. 541.1 (1994). Under the "short test," exempt status is given to any employee:

who is compensated on a salary basis at a rate of not less than $ 250 per week..., and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein....

29 **[**15]** C.F.R. 541.1(f).

It is undisputed that the Fire Captains and Chiefs received a bi-weekly salary equalling more than $ 250 per week. The district court found, however, that these employees could not be considered paid "on a salary basis" because of a City policy allowing for deductions in accrued leave for absences of less than a day. Because the court determined that the employees were not salaried, it did not reach the issue of whether the employees fulfilled the "duty" requirements under the short test.

*HN6*Exemptions to the FLSA are to be narrowly construed; the employer must show that the employee fits "plainly and unmistakenly within the exemption's terms" -- under both the "salary" test and the "duties" test. See Reich v. State of Wyoming, 993 F.2d 739, 741 (10th Cir. 1993). An employer must prove that the employee is exempt by "clear and affirmative" evidence. Donovan v. United Video, Inc., 725 F.2d 577, 581 (10th Cir. 1984).

A. Salary Test
*HN7*

Under both the short and long test for the executive exemption, the employer must **[*658]** prove that the employees in question are paid on a salary basis rather than an hourly rate. 29 C.F.R. 541.1(f); see also Abshire v. County of **[**16]** Kern, 908 F.2d 483, 486 (9th Cir. 1990). According to 29 C.F.R. 541.118(a) (1994), an employee is compensated on a salary basis if "under his employment agreement he regularly receives each pay period... a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."

The district court held that because the City had a policy requiring that absences of less than a day n1 be charged against accrued leave, the employees could not be considered salaried. Several circuits have held that policies penalizing an employee for absences of less than one day (at least when the penalty involved the possible loss of pay) indicate that employees subject to these policies are not salaried employees as defined by 29 C.F.R. 541.118(a), and therefore, preclude exemption of these employees from FLSA requirements under 29 C.F.R. 541.1. Kinney v. District of Columbia, 994 F.2d 6, 11 (D.C. Cir. 1993); Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 617 (2d Cir. 1991), cert. denied, 121 L. Ed. 2d 222, 113 S. Ct. 298 (1992); Abshire, 908 F.2d at 486. Other circuits have held that unless an employee's **[**17]** pay, as opposed to their compensatory leave, is actually docked, such a policy does not preclude exemption. McDonnell v. City of Omaha, 999 F.2d 293, 297 (8th Cir. 1993); York v. City of Wichita Falls, 944 F.2d 236, 242 (5th Cir. 1991); Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 805 (11th Cir. 1991). We need not decide which of these two interpretations to adopt, because even the circuits requiring less than actual docking to preclude exemption, require an express policy that an employee's actual pay will be reduced in the event that accrued leave is exhausted. The record shows that none of the employees in question here ever had their pay docked under such a policy. Only accrued leave was affected by days missed. Indeed, the firefighters have presented no evidence that the City had an express policy of docking pay for time missed. Thus, under either line of of cases above, the City's policy of docking paid leave does not preclude salary status as a matter of law.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 We find no allegations of docking for absences of greater than one day, in which case a distinction is drawn between different types of absences. See generally 29 C.F.R. 541.118(a).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[**18]**

The district court also relied on the fact that the firefighters in question received compensation for overtime hours. The regulations provide however, that "additional compensation besides the salary is not inconsistent with the salary basis of payment." 29 C.F.R. 541.118(b); see also 57 Fed. Reg. 37666, 37673 (indicating that overtime compensation falls within the meaning of the type of extra compensation allowed under 29 C.F.R. 541.118(b)). The regulation uses commissions as an example of a type of additional compensation covered by the regulation, but there is nothing in the regulation which significantly distinguishes commissions (extra compensation resulting from superior productivity while working) from overtime (extra compensation for a greater number of hours worked).

The district court also pointed to the fact that the paystubs of the allegedly exempt employees indicated the number of hours covered by the pay check. Since overtime is not inherently inconsistent with one's status as a salaried employee, the fact that the firefighters' paystubs indicated the number of hours covered is also not inconsistent with salaried status.

Such an accounting of hours is necessary **[**19]** to compute overtime compensation.

The City claims, and the firefighters do not dispute, that the chiefs and captains were paid a predetermined amount constituting at least part of their compensation. The MOAs and the salary ordinances set a biweekly salary, and not an hourly rate, for these employees. Neither the fact that their accrued leave could be deducted for absences, nor the fact that they were paid overtime, nor the fact that their paychecks indicated the number of hours covered contradicts the conclusion that they regularly received a "predetermined amount constituting . . . part of [their] compensation, which [was] not subject to reduction because of **[*659]** *variations in the quality or quantity of work performed."* 29 C.F.R. 541.118(a). We therefore hold that the fire captains, fire battalion chiefs, and fire division chiefs were paid on a salary basis.

B. Duties Test

***HN8***

The short test in 541.1 also requires that to fall under the executive exemption, the employees in question must: 1) have as their primary duty "the management of the enterprise in which the employee is employed or of a customarily recognized department or *subdivision thereof"; and 2) this duty must include* **[**20]** "the customary and regular direction of the work of two or more other employees therein." 29 C.F.R. 541.1(f).

In Department of Labor v. City of Sapulpa, we held that, as a "rule of thumb," an employee's primary duty is executive if the employee spends more than 50% of his or her time performing management type functions.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CHRISTOPHER D. PRICKETT, ET AL, | * | CIVIL ACTION FILE NO. 1:97-CV-3395-TWT |
| Plaintiffs, | * | |
| | * | FAIR LABOR STANDARDS ACT CLASS ACTION |
| vs. | * | |
| | * | |
| DEKALB COUNTY, ET AL | * | |
| | * | |
| Defendants. | * | |

## CERTIFICATE OF SERVICE AND TYPE

Pursuant to Local Rule 7.1D, the undersigned counsel for the Plaintiff hereby certifies that the within principal brief has been prepared with a font size (Time New Roman 14) which was approved by the Court, and that I have this day served counsel for the opposing parties with a copy of the within and foregoing **Plaintiff's Motion for Reconsideration and Brief in Support Thereof,** by United States Mail, postage prepaid, addressed as follows:

Howard Walter Indermark
Dekalb County Law Department
1300 Commerce Drive
5th Floor
Decatur, GA 30030

Dated this 20thth day of February, 2003.

A. Lee Parks
State Bar No. 563750

PARKS, CHESIN & WALBERT, P.C.
26th Floor, 75 Fourteenth Street
Atlanta, Georgia 30309